# United States Court of Appeals for the Federal Circuit

SUNKIST GROWERS, INC.,

*Appellant,*

– v. –

INTRASTATE DISTRIBUTORS, INC.,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. PTO-1: 91254647*

## BRIEF FOR APPELLANT

LEIGH ANN LINDQUIST
SUGHRUE MION PLLC
2000 Pennsylvania Avenue NW,
  Suite 9000
Washington, DC 20006
(202) 293-7060
llindquist@sughrue.com

*Counsel for Appellant*

MARCH 11, 2024



# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1212 |
| **Short Case Caption** | Sunkist Growers, Inc. v. Intrastate Distributors, Inc. |
| **Filing Party/Entity** | Sunkist Growers, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 12/13/2023                    Signature:    /s/Leigh Ann Lindquist

                                    Name:    Leigh Ann Lindquist

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Sunkist Growers, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Leigh Ann Lindquist<br>Sughrue Mion PLLC | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF RELATED CASES ................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ON APPEAL ..................................... 1

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF THE ARGUMENT ..................................................... 5

ARGUMENT ........................................................................................ 6

    A.    Standard of Review ............................................................. 6

    B.    The Board's Finding of Dissimilarity of the Marks is Not Supported by Substantial Evidence and Resulted From Application of the Wrong Legal Standards .......................... 7

           1.    The Board Crafted an Inaccurate Narrative as to Commercial Impression of the KIST Marks ............... 9

           2.    The Board Improperly Selected Portions of Images to Support its Position Regarding the SUNKIST Commercial Impression ........................................ 16

           3.    Marks Are Obviously Similar in Sound and Appearance .......................................................... 30

    C.    The Board Failed to Consider the Nature of the Parties' Goods and the Evidence of Record when Considering Actual Confusion .......................................................... 34

CONCLUSION ................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*,
    115 U.S.P.Q.2d 1816 (T.T.A.B. 2015) .......................................................... 31, 32

*Ayush Herbs, Inc. v. MDR Fitness Corp.*,
    Can. No. 92061544 (T.T.A.B. Oct. 24, 2018) ....................................................42

*Big M Inc. v. U.S. Shoe*,
    *Co.*, 228 U.S.P.Q. 614 (T.T.A.B. 1985) ..............................................................32

*Burns Philp Food, Inc. v. Modern Prods., Inc.*,
    1 F.3d 1252, 28 U.S.P.Q.2d 1687 (Fed. Cir. 1993) ..................................... 10, 13

*Century 21 Real Estate Corp. v. Century Life of Am.*,
    970 F.2d 874, 23 U.S.P.Q.2d 1698 (Fed. Cir. 1992) ...........................................8

*Citigroup Inc. v. Capital City Bank Group, Inc.*,
    94 U.S.P.Q.2d 1645 (T.T.A.B. 2010) ...................................................... 32, 34, 35

*Coach Servs. v. Triumph Learning LLC*,
    668 F.3d 1356 (Fed. Cir. 2012).........................................................................30

*Eclipse Assocs. Ltd. v. Data Gen. Corp.*,
    894 F.2d 1114 (9th Cir. 1990) ..........................................................................41

*General Mills, Inc. v. Fage Dairy Processing Indus. S.A.*,
    100 U.S.P.Q.2d 1584 (T.T.A.B. 2011) ....................................................... 40, 43

*Han Beauty Inc. v. Alberto-Culver Co.*,
    236 F.3d 1333  (Fed. Cir. 2001)...........................................................................7

*Helene Curtis Inds. Inc. v. Suave Shoe Corp.*,
    13 U.S.P.Q.2d 1618 (T.T.A.B. 1989) ................................................................40

*In re Abcor Dev. Corp.*,
    588 F.2d 811 (C.C.P.A. 1978) .................................................................... 31, 32

*In re Ass'n of the U.S. Army*,
    85 U.S.P.Q.2d 1264 (TTAB 2007) ....................................................................35

*In re Bay State Brewing Co.*,
117 U.S.P.Q.2d 1958 (T.T.A.B. 2016) ................................................31

*In re Change Wind Corp.*,
123 U.S.P.Q.2d 1453 (T.T.A.B. 2017) .................................................17

*In re E.I. du Pont de Nemours & Co.*,
476 F.2d 1357 (C.C.P.A. 1973) ...........................................................6

*In re Mighty Leaf Tea*,
601 F.3d 1342 (Fed. Cir. 2010)............................................................7

*In re Miracle Tuesday LLC*,
695 F.3d 1339 (Fed. Cir. 2012)............................................................7

*In re P.T. Arista Latindo*,
Appeal No. 2017-1292 (Fed. Cir. Nov. 13, 2017) ................................. 10, 15, 30

*In re Toshiba Medical Sys. Corp.*,
91 U.S.P.Q.2d 1266 (T.T.A.B. 2009) ..................................................31

*In re Viterra Inc.*,
671 F.3d 1358 (Fed. Cir. 2012).......................................................... 6, 30

*Intrastate Brands Corp. v. McKee Foods Corp.*,
53 U.S.P.Q.2d 1910 (T.T.A.B. 2000) ...................................................9

*Krim-Ko Corp. v. Coca-Cola Bottling Co. of New York*,
390 F.2d 728 (C.C.P.A. 1968) .............................................................9

*Monarch Wine Co. v. Hood River Distillers, Inc.*,
196 U.S.P.Q. 855 (T.T.A.B. 1977) .....................................................42

*Moroccanoil, Inc. v. Perfumes World Com, Inc.*,
234 F. Supp. 3d 1026 (C.D. Cal. 2017) ...............................................41

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
782 F.2d 1508 (9th Cir. 1986) ...........................................................41

*Perfumebay.com Inc. v. eBay, Inc.*,
506 F.3d 1165 ...................................................................................41

*Rosenthal A.G., v. Rite Lite, Ltd.*,
986 F. Supp. 133 (E.D.N.Y. 1997) .....................................................42

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
    193 F. Supp. 3d 245 (S.D.N.Y. 2016) ...................................................42

*Versa Top Support Sys., LLC v. Georgia Expo, Inc.*,
    921 F.3d 1364 (Fed. Cir. 2019)..........................................................41

## Statutes & Other Authorities:

15 U.S.C. § 1067 ...................................................................................1

15 U.S.C. § 1071(a) ..............................................................................1

28 U.S.C. § 1295(a)(4)(B) .....................................................................1

37 C.F.R. § 2.52 ...................................................................................18

4 J. Thomas McCarthy, *McCarthy on Trademarks* § 23.12 (2023) ................. 40, 43

## STATEMENT OF RELATED CASES

There has been no other appeal from the same proceedings in the lower tribunal which was previously before this or any other appellate court under the same or a similar title, and there is no related case pending in this or any other court.

## JURISDICTIONAL STATEMENT

This is an appeal of an opposition proceeding before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office (the "Board"). The Board had jurisdiction over that proceeding under 15 U.S.C. §1067.

The U.S. Court of Appeals for the Federal Circuit has appellate jurisdiction to hear this case under 15 U.S.C. §1071(a) and 28 U.S.C. §1295(a)(4)(B).

The Board issued its final decision dismissing the notice of opposition on September 30, 2023. Appellant/Opposer Sunkist Growers, Inc. ("Sunkist") filed a Notice of Appeal on November 29, 2023.

## STATEMENT OF THE ISSUES ON APPEAL

1.      Whether the Board erred in finding no likelihood of confusion between Sunkist's SUNKIST marks and Intrastate's KIST marks where the relevant likelihood-of-confusion factors favor Sunkist.

2.      Whether, in finding no likelihood of confusion between Sunkist's SUNKIST marks and Intrastate's KIST marks, the Board erred in finding:

a.     Without any supporting record evidence, "[b]ecause the commercial impression engendered by KIST is significantly different from the commercial impression created by SUNKIST, and the appearance, sound and connotation are only superficially similar, the first DuPont factor weighs against likelihood of confusion."

b.     "[W]e find that there has been a reasonable opportunity for confusion to have occurred as the parties sell their carbonated sodas in the same geographic areas and by the same retailers since 2000."

## STATEMENT OF THE CASE

For well-over a hundred years, the SUNKIST mark has been used to identify fresh fruit.  Appx319-320.  Since 1909, Sunkist has held a trademark registration for the SUNKIST mark for oranges.  Appx319-320.  Over the years, Sunkist expanded its business to introduce SUNKIST fruit extractors in the 1910s, and soft drinks and concentrates for making soft drinks in the 1930s.  Appx321-323.

In the last few decades, Sunkist continued to grow through an impressive and expansive licensing program.  Today, Sunkist licenses its SUNKIST marks to forty-eight licensees.  Appx1600-1601.  These licensees manufacture, distribute, market, and sell SUNKIST branded food and beverages in over seventy countries.  Appx1600-1601.  In the United States, SUNKIST licensed beverage products

include carbonated soft drinks, 100% juice, juice drinks, flavored water, among other goods. Appx1601. Today, the biggest SUNKIST licensees are Keurig Dr. Pepper and Nestle Professional, both beverage licensees: Keurig Dr. Pepper for soft drinks and Nestle Professional for beverages dispensers. Appx1601-1602.

The SUNKIST marks and the wide range of SUNKIST branded products have been promoted in every manner over the last 100 years - advertisements ran in newspapers; door-to-door promotions; athletic competition sponsorships; placement in television shows. Appx322, Appx1518-1525, Appx1603. Presently, SUNKIST products are promoted through in-store displays, through all major social media (Instagram, Twitter, YouTube, Pinterest and Facebook), sampling at retail, store flyers, direct mail ads, digital and non-digital coupons, sporting events, and trade shows. Appx1603, Appx1717-1718.

Sunkist and its licensees have spent substantial amounts of money promoting and advertising the SUNKIST products. Appx1604-1605, Appx1718. All of the efforts to market and promote the SUNKIST branded products have resulted in enviable sales figures. Appx1604-1605, Appx1718.

The SUNKIST marks have massive exposure in the United States from SUNKIST soft drinks being available in many retail outlets to a significant percentage of U.S. households making a SUNKIST soft drink purchase in a 18-

month period.  Appx1718.  SUNKIST soft drinks are the number one selling orange soft drink in the United States.  Appx1716.

On October 19, 2019, Appellee/Applicant Intrastate Distributors, Inc. ("Intrastate") filed two intent to use trademark applications for the following marks: (1) KIST (word mark) and (2) KIST (stylized mark) both for "Soft drinks, namely, sodas and sparkling water; concentrates and syrups for making soft drinks."[1]  Appx1-2.

At the time Intrastate filed its trademark applications, Sunkist owned dozens of federal trademark registrations for its SUNKIST mark.  Appx320.  Sunkist relies on over a dozen pleaded federal trademark registrations in this proceeding.[2] Appx55-56.

On March 10, 2020, Sunkist timely opposed registration of the KIST marks. The parties engaged in discovery and submitted evidence during their assigned testimony periods. On September 30, 2023, the Board issued its decision in which it dismissed the notice of opposition against the KIST applications finding that the parties' marks were not confusingly similar.  Appx1-36.

_____

[1] Intrastate's applications and the marks in those are applications are hereinafter referred to the KIST marks.
[2] Sunkist's use of its marks and pleaded registrations are hereinafter referred to as the SUNKIST marks.

4

In rendering its decision, the Board found the majority of *DuPont* factors weighed decisively in Sunkist's favor:

- "[W]e find … that Opposer's mark is commercially strong for carbonated soda drinks, specifically, citrus flavored soda, and has a high degree of public recognition and renown." Appx21;

- "We find the [parties'] goods legally identical in part." Appx13;

- "The record is devoid of third-party uses or registrations of the same or similar sun-kissed formative ." Appx21;

- "Because the goods in Applicant's applications and Opposer's pleaded mark are legally identical in part, we presume that these identical goods will move in the same trade channels to the same classes of purchasers." Appx13; and

- "We find that the purchase of soft drinks is done with nothing more than ordinary care and is subject to impulse purchase." Appx14.

## SUMMARY OF THE ARGUMENT

The Board's decision dismissing the notice of opposition against the applications for the KIST marks was incorrect, and its findings are not supported by substantial evidence. The Board erred in finding no likelihood of confusion between the SUNKIST marks and KIST marks.

The Board's decision turned on two *DuPont* factors. First, on the similarity of the marks with an emphasis on the overall commercial impressions created by the marks which was based on a carefully curated selection of images from the record devoid of context. Second, failure to adequately review the evidence to correctly determine whether there were reasonable opportunities for actual confusion to occur. Substantial evidence does not support the Board's findings on either of these *DuPont* factors.

## ARGUMENT

A.     Standard of Review.

The U.S. Court of Appeals for the Federal Circuit reviews the Board's conclusions of law de novo and will affirm the findings of fact made by the Board if supported by substantial evidence. *In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012). The issue of likelihood of confusion is a question of law and is reviewed de novo by this Court. *Id.* The *DuPont*[3] factors are issues of fact which are reviewed by this Court for substantial evidence. *See id.* This Court has found

---

[3] *In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 1361 (C.C.P.A. 1973).

that substantial evidence means "more than a mere scintilla" of evidence. *In re Miracle Tuesday LLC*, 695 F.3d 1339, 1343 (Fed. Cir. 2012).

Importantly, "reasonable doubt as to the likelihood of confusion is resolved against the newcomer, 'for the newcomer has the opportunity of avoiding confusion, and is charged with the obligations to do so.'" *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346 (Fed. Cir. 2010) (citations omitted).

In weighing the *DuPont* factors to determine likelihood of confusion, the Board and this Court may focus on only those factors that are most relevant to the case at hand. *See Han Beauty Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336 (Fed. Cir. 2001). The most relevant factors here are: (1) the strength of the SUNKIST marks, (2) the similarity of the parties' marks, (3) the identical nature of the parties' products, trade channels, and classes of consumers, (4) the absence of evidence of relevant third-party use of marks similar to Sunkist's marks, and (5) the lack of actual confusion given Intrastate's overall insignificant use.

B. The Board's Finding of Dissimilarity of the Marks is Not Supported by Substantial Evidence and Resulted From Application of the Wrong Legal Standards.

In determining that the parties' marks were dissimilar, the Board stated:

> Because the commercial impression engendered by KIST is significantly different from the commercial impression created by SUNKIST, the appearance, sound and

> connotation are only superficially similar, the first
> *DuPont* factor weighs against likelihood of confusion.

Appx27. The Board reached the determination regarding the marks' commercial impressions by allegedly comparing the parties' trade dress. In fact, the Board ignored Intrastate's trade dress and instead relied on isolated marketing materials that Intrastate failed to place in context. There is zero evidence that these materials were ever seen by the public. When considering the Sunkist commercial impression, the Board curiously selected only certain images from the record and creatively cropped those images to reach a determination.

By focusing on these isolated marketing materials and limited Sunkist offerings as well as strategically cropped images, the Board failed to properly review the evidence of record.

In addition, the Board disregarded the well-settled principle that the degree of similarity necessary to support a conclusion of likely confusion declines where, as here, the parties' goods, customers, and trade channels are identical and overlap. *See Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 23 U.S.P.Q.2d 1698, 1700 (Fed. Cir. 1992). The Board correctly found that the *DuPont* factors related to the parties' goods, customers and trade channels favored Sunkist, but did not correctly weigh these considerations when determining whether or not the marks were similar.

8

The Board also failed to consider that similarity in any **one** of the elements of sound, sight, or meaning may be sufficient to prove a likelihood of confusion. *See Krim-Ko Corp. v. Coca-Cola Bottling Co. of New York*, 390 F.2d 728, 732 (C.C.P.A. 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (internal citation omitted); *Intrastate Brands Corp. v. McKee Foods Corp.*, 53 U.S.P.Q.2d 1910, 1914 (T.T.A.B. 2000) ("It is not necessary that marks be similar in all three of the elements of sight, sound, and meaning to support a finding of likelihood of confusion."). Here, the parties' marks are similar in sound, appearance and connotation. The Board performed legal gymnastics to reach a different conclusion as to all three variables.

> 1. The Board Crafted an Inaccurate Narrative as to Commercial Impression of the KIST Marks.

The Board recited the parties' arguments regarding the connotations created by the parties' marks without taking a position on those arguments,[4] and then said:

---

[4] The Board said that is took judicial notice of the Merriam-Webster dictionary to determine that "sun-kissed" means sunny or intense sunshine. Appx23. The Court is encouraged to access that dictionary as that is not the only dictionary definition for sun-kisssed at the Merriam-Webster site. In fact, the second definition is "having an attractive color because of having been in the sun". The Board cherry-picked the dictionary definition to fit a finding. Sunny fruit makes little sense. Fruit having an attractive color because of having been in the sun is sensible, and that definition supports Sunkist's arguments.

9

In connection with connotation and commercial impression, we can consider the parties' trade dress. *See Burns Philp Food, Inc. v. Modern Prods., Inc*., 1 F.3d 1252, 28 USPQ2d 1687, 1690 (Fed. Cir. 1993) ("[T]rade dress can be used as evidence of whether a word mark projects a confusingly similar or different meaning or impression."), quoting J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20.04 [1], at 20-28 (3d ed. 1992) (emphasis added in decision).

Appx24.  Next, the Board turned to the parties' marketing materials and based on that review, determined that the marks were dissimilar: KIST connotes a kiss and SUNKIST connotes the sun, and these are the commercial impressions of the marks.  Appx24-27.

As an initial point, more recent Federal Circuit guidance suggests the Board's reliance on the 1993 *Burns* case is misplaced.  In 2017, this Court said:

> *It is well-established that trade dress may not be used to prove that the commercial impressions are different, since trade dress may be changed at any time*. *See Vornado, Inc. v. Breuer Elec. Mfg. Co*., 390 F.2d 724, 727 (C.C.P.A. 1968) ("the [advertising] display of a mark in a particular style is of no material significance since the display may be changed at any time as may be dictated by the fancy of the applicant or the owner of the mark.")

*In re P.T. Arista Latindo*, Appeal No. 2017-1292, *5 (Fed. Cir. Nov. 13, 2017) (emphasis added).  The appeal here involves the Board impermissibly using "trade

dress" to prove the parties' commercial impressions are different. For this reason alone, the Board's decision should be reversed.

However, even if the Board's reliance on *Burns* was correct, which it is not, substantial evidence does not support the Board's findings. Specifically, the Board relied on the following single cropped image to support its position that KIST is marketed to reference a kiss:



Appx24.

In the record, the above image was taken from this page of a marketing presentation:



Appx2095. Importantly, the testimony provides no context for this presentation. There is no testimony evidence regarding when, where or how (or if) the marketing

materials were actually used.[5]  In addition, there are no images of this display on

the floor of a retail establishment.  On this record, there is zero evidence that a

consumer ever encountered this particular display or, in fact, any of the other

materials attached to Intrastate's testimony.

Furthermore, Intrastate's testimony fails to mentions "kiss" or kiss imagery,

and fails to provide any discussion about the commercial impression of KIST.

Appx1727-1731, Appx2316-2318. The Board's "trade dress" conclusion was

based on one cropped image of a product display from one page of a marketing

presentation.

If *Burns* continues to be accepted by this court, that case is distinguishable:

> The TTAB's finding that the commercial impression of
> the SPICE ISLANDS mark presents a "seafaring, South
> Seas image" is ***supported by ample evidence in the***
> ***record***, including ***the testimony*** of Burns Philp's
> President, Mr. Yuan, The Spice Islands Cookbook, and
> ***specimen labels***. Mr. Yuan specifically testified that the
> mark's image was exotic and wordly, "[t]hat of going to
> distant corners of the earth to find the best spices and
> herbs and seasoning; you can call it a nautical motive
> [sic] or image that we try to convey." Slip op. at 5. The
> text in The Spice Islands Cookbook also promotes the
> nautical, South Seas image of the mark by describing the
> history of the Spice Islands in connection with use of the

---

[5] The testimony reflects that the exhibits to the Dabish declaration include
"marketing materials".  In addition, "display items" were provided to distributors
and retailers.  Appx1729-1730.

mark. This nautical, South Seas theme is also reinforced
by the mental impression found by the Board to be
conveyed by the words SPICE ISLANDS. Additionally,
***the record contains numerous advertisements*** depicting
the SPICE ISLANDS mark in a nautical setting including
images of sea captains and references to exotic islands
and other remote locations. ***The labels convey much the
same image***. Thus, because the Board's finding as to
SPICE ISLAND's commercial impression is adequately
supported by the evidence of record, it is not clearly
erroneous.

*Burns Philp Food, Inc. v. Modern Prods., Inc*., 1 F.3d 1252, 28 U.S.P.Q.2d 1687,

1690 (Fed. Cir. 1993) (emphasis added).  There, the Board and this Court found a

theme running throughout the marketing of the product.  This finding was reached

based "on ample evidence" which included significant testimonial evidence. *Id.* at

1688-1689.  Furthermore, this court noted that it was "particularly appropriate"

there to consider Applicant's trade dress because Applicant's mark was not a pure

word mark but a stylized color mark with a design.  *Id.* at 1690.

Here, Intrastate submitted meager evidence during its testimony period.

Kiss imagery only appears on marketing materials.  Appx2091-2092, Appx2095-

2096, Appx2115-2117, Appx2123-2124.  There is no testimony about a kiss.

Appx1727-1731, Appx2316-2318.  There are no advertisements where KIST is

marketed as "kiss".  No testimony discusses marketing or advertising spend for this

product.  Appx1727-1731, Appx2316-2318.  Most importantly, kiss imagery does

13

not appear on any KIST product or any label for a KIST product. Appx2090, Appx2104, Appx2100. There is nothing of record that shows KIST was promoted to the public as a "kiss". Appx1727-1740, Appx2089-2130. The evidence here is drastically different from that in *Burns*, which again involved an application for a color logo mark.

In fact, the trade dress for KIST sparkling water, according to this record, is:



Appx2103. This trade dress emphasizes the flavor of the beverage. Orange mango flavored KIST has an orange and a mango on the label. A lemon appears on the lemon flavored KIST product. Appx2103.

What the record here shows is that Intrastate emphasizes, as may have its predecessor, the KIST beverage flavors. Its predecessor may have used color bands on the product: an orange band for KIST orange soda and a purple band for KIST grape soda, etc. to indicate flavor. The testimony does not affirmatively say that the image below reflects prior use of KIST on soft drinks:



Appx1727-1731, Appx2088.  In any event, Intrastate, as discussed above, uses

fruit images and corresponding colors to communicate beverage flavor.[6]

Appx2097, Appx2103.

Overall, Intrastate's product imagery suggests a fruit flavored beverage.

Appx2103.  A KIST purchaser can enjoy a beverage kissed with fruit flavor.

Nothing of record evidences that Intrastate's product is known by the **purchasing**

**public** as a kiss with one's lips and no imagery suggests anything remotely

romantic or erotic as Intrastate argued below.[7]

---

[6] This changing trade dress is the exact issue raised in *In re P.T. Arista Latindo*, Appeal No. 2017-1292, *5 (Fed. Cir. Nov. 13, 2017). Trade dress should not be considered to determine commercial impression.
[7] There is in fact evidence that the public may perceive SUNKIST as associated with a kiss or lips.  An Instagram photo of Beyonce wearing a SUNKIST t-shirt could be characterized as a thirst trap, and a member of the

The Board did not properly consider the evidence to reach a correct determination as to the KIST commercial impression. It completely ignored Intrastate's KIST products. Substantial evidence does not support the Board's finding. There is not even a scintilla of evidence to support the Board's finding here because there is zero evidence that the relied upon kiss imagery (or any other kiss imagery) was ever seen by the public.

    2.    The Board Improperly Selected Portions of Images to Support its Position Regarding the SUNKIST Commercial Impression.

Like its review of the evidence of the KIST product, the Board carefully and creatively selected imagery from the record to reach a conclusion regarding the SUNKIST commercial impression. The Board said that Sunkist "markets [its products] to reference the sun" and noted these images from the record:

 

---

public included lips in their response to the post next to "SUN KISS". This was an unsolicited image that social media users reposted to Sunkist social media accounts. Appx1614, Appx1703-1704.



The Board also stated that a sun design is included in some of Sunkist's registrations. Appx24-26.

As to the SUNKIST pleaded registrations, there are two registrations of record for a design mark where the design element includes what is described as a sun image. Appx54-58, Appx142-144, Appx151-152. That mark is:



The majority of pleaded registrations do not have a sun design, and are actually for standard character marks. Appx54-58. In any event, it well-settled that the description of the mark in a trademark registration or application does not control what the mark is. *See In re Change Wind Corp*., 123 U.S.P.Q.2d 1453, 1459 n.6 (T.T.A.B. 2017) ("the drawing of the mark, not the words an application uses to

describe it, controls what the mark is"); Trademark Rule 2.52, 37 C.F.R. § 2.52

("A drawing depicts the mark sought to be registered.").

Furthermore, as discussed in more detail below, use of the SUNKIST mark

in this registration is not limited to the color orange. Even when the registered

SUNKIST design mark is used in the color orange, consumers are likely to view

the design element as a piece of orange fruit because of the long history of fruit

imagery on SUNKIST beverages and because the "i" in SUNKIST is dotted with a

leaf, emphasizing the fruit connection. Appx142-144, Appx151-152.

Accordingly, the Board's reliance on the description in the registration to

determine commercial impression is misplaced both legally and on this record.

Turning to the Board's choice of the image below:



the selection is extremely curious given where this image appears in the record:



Appx25, Appx1645-1646. The overall commercial impression created by the webpage display is fruit flavoring. The webpage banner includes fruit, some of the packaging includes fruit imagery, and the color of the packaging corresponds to the products' fruit flavor. The orange package does not suggest the sun; it communicates orange flavor to the customer. A consumer likely encounters all of these products at once in the marketplace, not just one flavor.[8] On the Internet,

---

[8] We have the benefit of a SUNKIST soft drink product display in an *Elle* article about Beyonce. There, Beyonce leans against a shelf in the soft drink aisle of a store. On the top shelf is Sunkist strawberry lemonade and just beneath Sunkist grape soft drinks. The bottom shelf displays Sunkist orange soft drinks. Consumers actually encounter the SUNKIST products in a range of flavors and colors. The Board inexplicitly isolated one SUNKIST package to support its position. Appx1709.

consumers encounter the complete rainbow of colors, all of which communicate

flavor. Appx1645-1646.

As to the black and white images in the Board's decision, those images were

taken from a marketing presentation prepared by Sunkist licensee Keurig Dr.

Pepper. This is an internal presentation for new soft drink flavors. Appx321,

Appx1366-1395.

Most surprising is the Board's drastic cropping of these images. Below is a

comparison of the Board's cropped images vs. where the images appear in the

record:

 











Appx25, Appx1380, Appx1374, Appx1369, Appx1376.

The presentation introduced the newest flavor of SUNKIST soft drinks: strawberry lemonade, packaged in a clear bottle with a pink label and filled with the pink colored lemonade beverage.  Appx1371-1376.  Below is the SUNKIST strawberry lemonade product in color:



Appx1626. The evidence of record also shows this product in a retail environment. Appx1709.

The Keurig Dr. Pepper presentation and the planned promotions featured in that presentation focused on flavor: "The Newest Flavor Under the Sun", "The Newest Shade of Lemonade", "…Our Flavor Pipeline", "Soak Up Some Flavor", "Flavors for Cash", "Flavor Up Your Game". Appx1371-1374, Appx1380, Appx1385, Appx1391-1393. The theme for this promotion was clearly flavor, not the sun.

Furthermore, the Rainbow of Flavors referred to in one of the images from the Board's decision correlates to the various color beverages that Sunkist offers:



Appx1626-1627. These are of course different flavored soft drinks.

The Board may have selected these black and white images to support its position because the contrast of the circle image behind the SUNKIST mark is very pronounced in black and white, much more so than when the actual SUNKIST soft drink product line is viewed in color. Appx25, Appx1626-1636.

Regardless of the Board's reason for its selection, this record does not evidence that Sunkist consistently uses a sun image across its marketing and promotion to communicate to the purchasing public that SUNKIST means the sun. The record is replete with actual Sunkist uses that the public sees. For example:















Appx1622, Appx1638, Appx1655, Appx1658, Appx1685, Appx1688, Appx1691, Appx1694.

Furthermore, Sunkist does not limit its use of its mark on its products to this registered mark:



in an orange color. Throughout the record are color images of how the SUNKIST marks are used on its various products. These include, but are not limited to:



   



Appx1629, Appx1648, Appx1650, Appx1652, Appx1665, Appx2447, Appx2451, Appx1701-1704.

What permeates Sunkist marketing, promotion, and packaging is a fruit and citrus flavor theme. In fact, the 2019 Keurig Dr. Pepper's marketing presentation upon which the Board relies almost entirely to support its conclusion regarding the SUNKIST marks' commercial impression supports Sunkist's argument. The new flavors and marketing around the flavors was to reinforce Sunkist's citrus connotation. Appx1387. SUNKIST's commercial impression is not the sun. It is sun kissed fruit and fruit flavored products.

26

Historical uses of SUNKIST support Sunkist's argument:





























Appx1010, Appx1035, Appx1094, Appx1132, Appx1136, Appx1140, Appx1144, Appx1147, Appx1150, Appx1159, Appx1163, Appx1169,  Appx1176, Appx1528, Appx1530, Appx1534, Appx1535, Appx1540, Appx1546, Appx1557, Appx1558, Appx1586, Appx985-986, Appx977-978.

In short, the Board erred in its assessment regarding commercial impression. Substantial evidence does not support the Board's finding.  What the substantial evidence actually shows is that the trade dress of the parties' respective products have the same theme – fruit flavors.  The parties' trade dress re-enforces the concept that the marks have similar commercial impressions - sun kissed fruit flavor vs. kissed with fruit flavor.

It is clear on this record, that both Sunkist and Intrastate promote their products' fruit flavor.  There is no doubt that the commercial impressions are very

similar. Furthermore, the Board did not need to turn to the parties' trade dress to determine commercial impression. SUNKIST evokes sun-kissed fruit flavor when applied to a beverage, while KIST suggests the beverage is kissed with flavor.[9]

Notably, the Board appears to have used the parties' trade dress to "prove [the] absence of confusion" which this court has said may not be done. *In re P.T. Arista Latindo*, Appeal No. 2017-1292, n.2 (Fed. Cir. Nov. 13, 2017) ("it is well-established that trade dress may not be used to prove absence of confusion.").

### 3. Marks Are Obviously Similar in Sound and Appearance.

The Board further erred when considering the similarity of SUNKIST and KIST with respect to appearance and sound. The Board held:

> The marks are similar in appearance and sound to the extent they both contain the term KIST. Although there is no correct pronunciation of a trademark, *In re Viterra Inc.*, 101 USPQ2d at 1912, both Opposer and Applicant are in agreement that KIST, the entirety of Applicant's mark and the suffix portion of Opposer's SUNKIST mark, can be pronounced phonetically as "kissed," which makes Applicant's mark similar in sound to the KIST suffix portion of Opposer's pleaded mark. The marks are dissimilar in appearance and sound to the extent that Opposer's pleaded mark contains the additional lead word SUN.

---

[9] Commercial impression is assessed by considering the nature of the parties' goods, not in the abstract. *See Coach Servs. V. Triumph Learning LLC*, 668 F.3d 1356, 1368-1369 (Fed. Cir. 2012).

> …the appearance, sound and connotation are only
> superficially similar,..

Appx23, Appx27.  This was the entire discussion regarding appearance and sound.

The parties' marks share KIST.  SUNKIST and KIST sound and look similar.  The Board appears to take the position that no mark with KIST can be considered similar in sound and appearance to SUNKIST.  The only marks similar to SUNKIST according to the Board, are those that are or include SUN.  This cannot be, and is not, correct.

Further, under the Board's analysis, the Board should have found the marks in the following cases dissimilar.  *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 U.S.P.Q.2d 1816, 1822-1823 (T.T.A.B. 2015) (WINEBUD similar to BUD); *In re Toshiba Medical Sys. Corp.*, 91 U.S.P.Q.2d 1266 (T.T.A.B. 2009) (VANTAGE TITAN similar to TITAN).

In making its determination as to sound and appearance, the Board failed to consider Federal Circuit and Board precedent that "users of language have a universal habit of shortening full names from haste or laziness or just economy of words.  Examples are: automobile to auto; telephone to phone; necktie to tie; gasoline service station to gas station".  *In re Abcor Dev. Corp.*, 588 F.2d 811, 814 (C.C.P.A. 1978) (J. Rich, concurring); *see also In re Bay State Brewing Co.*, 117 U.S.P.Q.2d 1958, 1961 (T.T.A.B. 2016) ("we also keep in mind the penchant of

31

consumers to shorten marks." *See In re Abcor Development Corp.*, 588 F.2d 811, 200 U.S.P.Q. 215, 219 (C.C.P.A. 1978)…; *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 U.S.P.Q.2d 1816, 1819 (T.TA.B. 2015) ("While Opposer's beer was originally sold under the BUDWEISER brand, customers soon began to abbreviate the mark, calling for BUDWEISER beer just by the name 'BUD.'")); *Big M Inc. v. U.S. Shoe Co.*, 228 U.S.P.Q. 614, 616 (T.T.A.B. 1985) ([W]e cannot ignore the propensity of consumers to often shorten trademarks[.]").

If the Board had followed this guidance, it would have found that consumers are likely to view SUNKIST and KIST as similar in sound and appearance. Because of the penchant or propensity of consumers to shorten trademarks, consumers are very likely to believe that KIST for a fruit flavored sparkling water beverage or a soft drink is associated with or approved by or otherwise affiliated with Sunkist which is known for fruit and fruit flavored beverages and novelties. This is emphasized by the fact that Sunkist has the number one selling orange flavored soft drink. Appx1716.

The marks are obviously similar in sound and appearance. The Board clearly erred here. Moreover, this situation is distinguishable from *Citigroup Inc. v. Capital City Bank Group, Inc.*, 94 U.S.P.Q.2d 1645 (T.T.A.B. 2010) which the

Board cites in its finding that SUNKIST and KIST "are only superficially similar".

Appx26-27.

There, the Board found that CITIBANK and CAPITAL CITY BANK for

identical services, were not confusingly similar. In so holding, the Board said:

> The frequent adoption and third-party use of the term
> "City Bank" suggests that third parties use the word The
> frequent adoption and third-party use of the term "City
> Bank" suggests that third parties use the word "Bank" in
> the term "City Bank" as a generic designation for
> banking services while the word "City" is used as part of
> a geographic name (e.g., Lake City - bank, Hastings City
> - bank) or, in the alternative, as a designation for a
> community [*64] bank (e.g., City Bank of Lynwood or
> First City Bank). Accordingly, while opposer may have
> the exclusive right to use CITIBANK, the term "City
> Bank" is used by others to convey the alternative
> meanings described above. Notwithstanding the various
> uses of "City Bank," these uses do not diminish the
> strength of opposer's mark.
>
> With respect to the marks at issue, applicant's marks are
> superficially similar to opposer's marks to the extent
> applicant's marks include the term "City Bank" while
> opposer has used and registered the term "Citibank."
> However, because applicant's marks start with the word
> "Capital," the commercial impression engendered by
> applicant's marks is entirely different. Applicant's marks
> will be perceived as CAPITAL CITY . . . bank, not as
> CAPITAL . . .CITY BANK. In applicant's CAPITAL
> CITY BANK marks, the term "Capital City" is perceived
> as a geographic designation and "Bank" is a generic
> designation. As such, we note that applicant's marks fall
> outside of opposer's own criteria for identifying similar

> marks likely to cause confusion with opposer's
> CITIBANK marks.

*Id.* at 1663-1664.  The applicant in that case introduced impressive third party use

of City Bank that included **testimony** from third party witnesses from certain of

these third party City Bank users.  It was in the context of that very significant (and

unusual) evidence that the Board found CITIBANK and CAPITAL CITY BANK

only superficially similar.

Here, there is zero evidence of any use of SUNKIST except by Sunkist, and

no evidence of use of KIST for any goods other than those sold by Intrastate.[10]

Appx21, Appx2321-2322.  There is no testimonial evidence of the nature of that in

*Citibank*.

The Board's finding that the marks are dissimilar is clearly and obviously

not supported by substantial evidence.

C.    The Board Failed to Consider the Nature of the Parties' Goods and the
      Evidence of Record when Considering Actual Confusion.

Here, the Board said:

> However, we find that Applicant's sales of the products,
> although more regional, were and are in overlapping

---

[10] It is worth noting that there is no image of a KIST beverage in a real-world environment of record.

geographic markets with Opposer's products, offered in the same retail stores, and have co-existed in those same geographic markets for a significant period of time. We find that Applicant's sales are not so de minimis that the lack of actual confusion is insignificant. *See Citigroup*, 94 USPQ2d at 1662 (finding no actual confusion significant based on applicant's use of the mark since the late 1970s at 69 bank branches in Florida, Georgia and Alabama); *In re Ass'n of the U.S. Army*, 85 USPQ2d 1264, 1273 (TTAB 2007) (concurrent use of the marks in the same geographic area for a significant period may "suffice[ ] to establish, under the eighth du Pont factor, that the absence of evidence under the seventh du Pont factor is legally significant and entitled to some weight.").

Appx29-30.

To reach this conclusion, the Board considered the parties' testimony evidence but failed to review Intrastate's actual sales data. Delving into Intrastate's sales data provides details of a small scale operation with declining sales of KIST despite rebranding efforts.[11]

As an initial point, there is no sales information from 2000-2005. Appx1727-1731, Appx2316-2318. Attached to the Dabish testimony is a portion of a presentation given by Intrastate predecessor to Intrastate. Appx1728. In that partial presentation, Mr. Dabish says there are "sales and other documents" from

---

[11] Sunkist does not include all of the sales data in the Appendix but refers the court to the complete sales data which is in the record below.

its predecessor.  Appx1728.  Intrastate cannot and did not rely on these materials to prove sales as these are not Intrastate's sales documents and Mr. Dabish merely states he received these materials.  Appx1728.  Mr. Dabish concludes his testimony by providing Intrastate's sales information.  Appx1730.

The first sales data for Intrastate is from October 2009 to December 2010 and is frankly not impressive.  Appx2138.

There is no sales information for 2011-2012.

From January 2013 to October 2013, the data shows zero sales. Appx2257.

The sales for 2014 are so insignificant that there could be no commercial impact of KIST in any marketplace.  Appx2257.

In 2015, sales appear to increase but the sales remain unimpressive.  Appx2239.  When the sales data for 2015 and 2016 is considered in detail, it is clear that this is a product that is struggling for shelf placement.  Appx2239.

Most importantly, the sales information from January 1, 2016 to October 5, 2020 evidences declining sales. Appx2132-2133.  In fact, from 2016 to 2020, sales drop more than 50%.  There is no sales data after October 5, 2020.

To summarize, the sales data shows:

- o  No sales before prior to October 2009.

- o  2010 sales that are not impressive.  Appx2138.

- No sales from 2011 to October 2013.

- Very insignificant sales in 2014. Appx2257.

- Overall declining sales from 2015 to 2020, with 2020 more than half of sales in 2016. Appx2132.

The evidence does not show continuous use of KIST and for those years after which Interstate acquired KIST, the product was not sold in any appreciable manner to allow for a reasonable opportunity for actual confusion to come to either party's attention. The Board was simply wrong in finding that there were reasonable opportunities for confusion to occur.

To reach its inaccurate assessment of Intrastate's sales, the Board appears to rely exclusively on Intrastate's testimonial declarations. Only vague statements regarding "sales" of KIST are found in testimony. Mr. Smith testified that he **promoted** the Kist brand in 2000. Appx2316. He only identifies one store where KIST products were **sold**. Appx2317. Mr. Smith identifies distributors that purchased KIST products but he never testifies that these products were available to the public. Appx2316-2317. As someone who claims to have knowledge of KIST sales since 2000, Mr. Smith's declaration is shocking in its lack of details.

In fact, neither Mr. Smith nor Mr. Dabish provide any illuminating information regarding sales of KIST at any time.[12]  Much of their testimony is limited to discussions regarding promotion of the product.  Mr. Dabish does testify to "sales" but his statements are broad.  Appx1729.  For example, he says that "KeHE distributes Kist products to Publix Super Market chain which has stores throughout the Southeast."  Appx1729-1730.  Looking at the sales data for the first seven months of 2016, KeHE is number nine in terms of top buyer of KIST products.  Appx2139.  However, the actual number of KIST products KeHE purchased is underwhelming.  Appx2139.  The Board failed to consider the sales data and testimony in tandem, and further gave excessive weight to the testimony.

Furthermore, Mr. Dabish testified that the "primary marketing efforts for [the] Kist products has been to approach national and regional (and international) distributors to purchase the Kist products and to distribute those products to various retail chains and outlets that they service."  Appx1729.  This means that the some portion of the sales data appears to reflect sales to distributors (including

---

[12] The weight the Board gave unsubstantiated statements in these testimonial declarations is in stark contrast to the weight given Sunkist's testimonial declarations.  For example, the Board said "…this testimony is lacking in specifics as to frequency, and audience reach…" about Sunkist's testimony,  Appx20.

international distributors) and those distributors may or may not have been successfully in distributing the KIST product to actual retail chains and outlets.

Importantly, the U.S. sales for these periods (whatever they may be) has not been separated from the gross number making it impossible to know actual sales in the United States during those periods. Moreover, in those years, KIST products may not have been available to the public; Intrastate sold to distributors who in turn worked to place KIST beverages in retail outlets. There is no evidence of record as to how successfully these distributors were in their efforts to have KIST products reach retail shelves. The sales data when viewed in the correct context and with the testimony evidence fails to show that there were reasonable opportunities for actual confusion to arise.

A detailed review of the actual sales data evidences insignificant sales throughout various years, zero sales in other years, most recently declining sales, and no sales after October 2020. It further fails to establish that KIST products ever made their way to retail stores in certain years.

The Board's causal review of Intrastate's testimony and sales data resulted in an inaccurate assessment of the actual confusion factor of *DuPont*.

Furthermore, because the parties' products are inexpensive items and are grocery products:

it is not clear from the record that, even if confusion did occur, consumers would report such confusion, making evidence of actual confusion difficult to obtain … evidence of actual confusion is notoriously difficult to come by and … where relatively inexpensive items such as food products are involved, confusion about sponsorship or affiliation would not necessarily be brought to the attention of either applicant or opposers.

*General Mills, Inc. v. Fage Dairy Processing Indus. S.A.*, 100 U.S.P.Q.2d 1584, 1604 (T.T.A.B. 2011) (citing *Helene Curtis Inds. Inc. v. Suave Shoe Corp.*, 13 U.S.P.Q.2d 1618, 1623 (T.T.A.B. 1989)).

McCarthy is also instructive on this point:

Recognizing that it is very difficult, and often impossible, to obtain reliable evidence of actual confusion of buyers, the courts often make statements to the effect that: "Actual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition, it being recognized that reliable evidence of actual confusion is practically impossible to secure." Similarly, "[t]he law recognizes that random instance of confusion often go unreported or unrecorded." Persons who are truly confused will often never be aware of the deception. Others who were confused and later learned of their deception will often not bother to report the fact.

4 J. Thomas McCarthy, *McCarthy on Trademarks* §23.12 (2023).

When the fluctuating, never particularly impressive and overall non-specific KIST sales are considered in the context of the parties' inexpensive goods, the

actual confusion factor is neutral.  There simply was limited opportunity for actual

confusion to occur.

And, just because the parties' marks may have coexisted in the marketplace

without evidence of actual confusion is not determinative.  Importantly and

correctly, courts have repeatedly found that lack of actual confusion is not

dispositive.  In fact, this Court said:

> However, "[t]he failure to prove instances of actual
> confusion is not dispositive against a trademark plaintiff,
> because actual confusion is hard to prove . . . ."
> *Brookfield*, 174 F.3d at 1050; *see also Au-Tomotive Gold*,
> 457 F.3d at 1077 (same); *Eclipse Assocs. Ltd. v. Data
> Gen. Corp.*, 894 F.2d 1114, 1118-19 (9th Cir. 1990)
> ("Though the court found no evidence of actual
> confusion, this is merely one factor to be considered . . .
> and it is not determinative." (omission in original)
> (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 782
> F.2d 1508, 1509 (9th Cir. 1986))).

*Versa Top Support Sys., LLC v. Georgia Expo, Inc.*, 921 F.3d 1364 (Fed. Cir.

2019).

Other courts agree.  *See Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165,

1176 (9th Cir. 2007) (lack of "actual confusion is not dispositive against a

trademark plaintiff . . . difficulties in gathering evidence of actual confusion make

its absence generally unnoteworthy"); *Moroccanoil, Inc. v. Perfumes World Com,

Inc.*, 234 F. Supp. 3d 1026, 1032 (C.D. Cal. 2017) ("Evidence of actual confusion

is not required, as it may be difficult to present evidence of actual consumer confusion); *Schutte Bagclosures Inc.* v. *Kwik Lok Corp.*, 193 F. Supp. 3d 245, 274 (S.D.N.Y. 2016) ("Lack of actual confusion, however, is not dispositive."); *Rosenthal A.G., v. Rite Lite, Ltd.*, 986 F. Supp. 133, 144 (E.D.N.Y. 1997) ("actual confusion is not a prerequisite for a finding of confusion under the Polaroid test nor is the lack of actual confusion alone a valid ground for a finding of no confusion").

Moreover, the Board has found a likelihood of confusion where the parties' products existed for twenty years. In *Ayush Herbs, Inc. v. MDR Fitness Corp.*, Can. No. 92061544, at \*22-23 (T.T.A.B. Oct. 24, 2018), the Board found

> Despite the lack of any reported instances of confusion over the past 20 years, because the marks are similar, the goods are in part identical and there is a presumption that the goods are offered in the same channels of trade and are sold to the same classes of consumers, we find that Respondent's mark CARDIO TONE for "dietary and nutritional supplements" is likely to cause confusion with the registered mark CARDITONE for dietary supplements.

Similarly, in *Monarch Wine Co. v. Hood River Distillers, Inc.*, 196 U.S.P.Q. 855, 857 (T.T.A.B. 1977), the Board determined despite almost twenty years of coexisting use, "the absence of actual confusion does not preclude a conclusion

that confusion is likely. Furthermore, evidence of actual confusion is neither easy to come by nor necessary to show that likelihood of confusion exists."

Here, there is no evidence of coexistence in the marketplace for twenty years. The Board's conclusion that KIST has been used in the marketplace since 2000 is simply not supported by the record. Appx28. Intrastate's evidence shows sporadic use and declining sales. Intrastate's unsupported and vague statements regarding sales cannot cure these deficiencies. *See General Mills*, 100 U.S.P.Q.2d at 1603 ("Applicant relies on certain testimony to show that ample opportunity for actual confusion has existed, however, this testimony, at best, is vague as to where and when applicant's products were sold and, at worst, confirms that it was not until 2008 when applicant completed its production plant in New York state that it greatly expanded into more mass market retailing nationwide").

And of course, the test is not actual confusion, it is likelihood of confusion. 4 *McCarthy* §23.12 (2023).

For these reasons, the Board was incorrect in determining that there were opportunities for actual confusion to occur and finding that the *DuPont* actual confusion factor favors Intrastate.

# CONCLUSION

The record in this case is clear. The *DuPont* factors favor Sunkist or are neutral.

Under a correct legal analysis, the SUNKIST marks and KIST marks are similar in sound, appearance and connotation. In addition, the actual confusion factor is neutral given the nature of the parties' goods and Intrastate's overall insignificant sales coupled with Intrastate's vague and unhelpful testimony.

The Board failed to review the record in full. The Board's decision that there is no likelihood of confusion is wrong as a matter of law and because its underlying findings are not supported by substantial evidence.

Dated: March 11, 2023                    Respectfully submitted,

                                         */s/ Leigh Ann Lindquist*
                                         Leigh Ann Lindquist
                                         SUGHRUE MION, PLLC
                                         2000 Pennsylvania Avenue NW
                                         Suite 9000
                                         Washington, DC 20006
                                         Tel: (202) 293-7060
                                         Fax: (202) 293-7860

                                         *Attorneys for Appellant*
                                         *Sunkist Growers, Inc.*

# ADDENDUM

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed: September 30, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Sunkist Growers, Inc.*

*v.*

*Intrastate Distributors, Inc.*

_____

Opposition No. 91254647

_____

Leigh Ann Lindquist of Sughrue Mion, PLLC
    for Sunkist Growers, Inc.

Michael O. Cummings of Cummings, McClorey, Davis and Acho, P.L.C.
    for Intrastate Distributors, Inc.

_____

Before Shaw, Goodman, and Elgin,
    Administrative Trademark Judges.

Opinion by Goodman, Administrative Trademark Judge:

    Intrastate Distributors, Inc. ("Applicant" and IDI) seeks registration on the

Principal Register of the mark KIST (in standard characters)[1] and the stylized mark

_____

[1] Application Serial No. 88647761 was filed on October 9, 2019 based on Applicant's assertion
of a bona fide intent to use the mark in commerce under Trademark Act Section 1(b), 15
U.S.C. § 1051(b).

Opposition No. 91254647



[2] both identifying "Soft drinks, namely, sodas and sparkling water; concentrates and syrups for making soft drinks" in International Class 32.

Sunkist Growers, Inc. ("Opposer") opposes registration on the ground of likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), and on the ground of dilution under Trademark Act Section 43(c), 15 U.S.C. § 1125(c). Opposer pleads ownership of multiple registrations for SUNKIST (standard character and typed drawing),[3] stylized, and word and design marks, for fresh fruits and various beverages and concentrates including the following registrations:

- SUNKIST (standard characters) for citrus-flavored, non-alcoholic, maltless beverages sold as soft drinks and concentrates for making the same in International Class 32;[4]

- SUNKIST (standard characters) for citrus flavored soft drinks and concentrates for making the same; and citrus fruit products used as ingredients in such soft drinks-namely, citrus oils in International Class 32;[5]

[2] Application Serial No. 88647766 was filed on October 9, 2019 based on Applicant's assertion of a bona fide intent to use the mark in commerce under Trademark Act Section 1(b), 15 U.S.C. § 1051(b). Applicant included the following description of the mark: "The mark consists of the word 'KIST' displayed in stylized font, namely, block letters." Color is not claimed as a feature of the mark.

[3] A mark depicted as a typed drawing is the legal equivalent of a standard character mark. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012); *see also* TRADEMARK MANUAL OF EXAMINING PROCEDURE § 807.03(i) (July 2022).

[4] Registration No. 301281, issued February 21, 1933 (pre-Lanham Act), sixth renewal.

[5] Registration No. 578492 issued August 11, 1953 on the Principal Register, fifth renewal. The registration was amended to standard characters and includes the following statement:

2

Opposition No. 91254647

- SUNKIST (standard characters) for Mineral, vitamin, or nutritionally enhanced water in International Class 5; Flavored enhanced water; Flavored waters in International Class 32;[6]

- SUNKIST (standard characters) for Fruit-flavored beverages; Lemonade in International Class 32;[7]

-  for soft drinks in International Class 32;[8]

-  for soft drinks in International Class 32;[9]

-  for soft drinks in International Class 32;[10] and

---

"The mark consists of standard characters, without claim to any particular font, style, size, or color is inserted. The drawing is amended to appear as follows: SUNKIST."

[6] Registration No. 4042223 issued on the Principal Register October 18, 2011, first renewal.

[7] Registration No. 5123351 issued on the Principal Register January 17, 2017.

[8] Registration No. 2229120 issued on the Principal Register March 2, 1999, second renewal.

[9] Registration No. 2229121 issued on the Principal Register March 2, 1999, second renewal.

[10] Registration No. 4482629 issued on the Principal Register March 11, 2014, first renewal. The mark includes the following description: "The mark consists of the literal element 'Sunkist' over the image of a sun with rays, and a leaf dotting the 'I' in 'Sunkist'." Color is not claimed as a feature of the mark.

Opposition No. 91254647

- **Sunkist** for "fruit juices" in International Class 32.[11]

In its answer, Applicant denies the salient allegations in the notice of opposition

and asserts "affirmative defenses" in the form of amplifications of its denials.[12]

---

[11] Registration No. 2766709 issued on the Principal Register September 23, 2003, second renewal.

The additional 9 pleaded registrations for oranges and various beverages and concentrates and related goods are as follows:

- Registration No. 72087 SUNKIST (typed) issued January 5, 1909 (pre-Lanham Act), sixth renewal;

- Registration No. 301278 SUNKIST (typed) issued February 21, 1933 (pre-Lanham Act), sixth renewal;

- Registration No. 599437 SUNKIST (standard characters) issued on the Principal Register December 14, 1954, fourth renewal;

- Registration No. 1215135 SUNKIST (typed drawing) issued on the Principal Register November 2, 1982, third renewal;

- Registration No. 2766709 **Sunkist** issued on the Principal Register September 23, 2003, second renewal;

- Registration No. 5922603 issued on the Principal Register November 26, 2019;

- Registration No. 5863607 SUNKIST (standard characters) issued on the Principal Register September 17, 2019;

- Registration No. 5515551 issued on the Principal Register July 10, 2018.

- Registration No. 4467927 SUNKIST (standard characters) was pleaded in the notice of opposition but cancelled during the pendency of the proceeding so Opposer does not rely on it.

[12] Answer, 4 TTABVUE; refiled at 5 TTABVUE. Citations in this opinion to the briefs and other materials in the case docket refer to TTABVUE, the Board's online docketing system. *See New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *2 n.1 (TTAB 2020).

Opposition No. 91254647

Each party filed a trial brief and Opposer filed a reply brief.[13]

**The Record**

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of the involved applications. In addition, the parties introduced the following testimony and evidence.

Opposer submitted a first notice of reliance on pleaded registrations (25 TTABVUE), a second notice of reliance on printed publications (29 TTABVUE), a third notice of reliance on oppositions filed, relating to policing its marks (45 TTABVUE), a fourth notice of reliance on records from the U.S. Border Control Trademark Protection database, relating to policing of its marks (46 TTABVUE), and a fifth notice of reliance on internet materials, relating to Opposer's licensing activities (49 TTABVUE).[14] Opposer submitted testimony declarations from Karen Holme, Manager of Intellectual Property at Opposer Sunkist Growers, Inc. (28 TTABVUE (confidential declaration testimony and exhibits at 26 and 27 TTABVUE)); Mark Madden, Vice President of Marketing and Global Licensing of Sunkist Growers, Inc. (31 and 47 TTABVUE (confidential testimony at 30 and 48 TTABVUE)); and Derek Dabrowski, Vice President of Marketing - Carbonated Soft

---

Applicant included amplifications of its denial of likelihood of confusion as "affirmative defenses" which are not true affirmative defenses. *Shenzhen IVPS Tech. Co. Ltd. v. Fancy Pants Prods., LLC*, 2022 USPQ2d 1035, at *3 n.5 (TTAB 2022) ("amplifications [of denials] are not true affirmative defenses").

[13] Opposer's brief is at 53 TTABVUE; its confidential brief is at 52 TTABVUE; and its reply brief is at 57 TTABVUE. Applicant's brief is at 56 TTABVUE.

[14] The website URL was provided but there was no date of access provided or listed; however, the omission is waived, since Applicant did not object.

Opposition No. 91254647

Drinks Category at Keurig Dr. Pepper Inc. (33 TTABVUE (confidential testimony at

32 TTABVUE)).[15]

Applicant submitted a first notice of reliance on a list of registrations (42

TTABVUE).[16] Applicant submitted the testimony declarations of Tim Dabish, CEO

of Intrastate Distributors, Inc. (43 TTABVUE (confidential testimony at 40

TTABVUE)); and Randal Smith, Division Sales Manager for Intrastate Distributors,

Inc. (44 TTABVUE (confidential testimony at 41 TTABVUE)).

**The Parties and Background**

Opposer Sunkist Growers is a 130-year old "agricultural marketing cooperative

representing thousands of fruit growers," operating under the SUNKIST brand since

the early 1900s and offering fresh fruit and licensing a variety of products and

---

[15] As extended, Opposer's testimony period was set to close on May 7, 2022, which was a Saturday. This testimony was filed on May 9, 2022, the next business day and is timely. Trademark Rule 2.196, 37 C.F.R. § 2.196.

[16] Applicant's testimony period closed on September 4, 2022 which was a Sunday. The next day was a federal holiday. Therefore, Applicant had until September 6, 2022 to file its testimony and evidence. Trademark Rule 2.196, 37 C.F.R. § 2.196. Applicant's first notice of reliance (42 TTABVUE) was filed on September 7, 2022 which was one day after its testimony period closed; however, because Opposer discussed the list and some of the registrations in its reply brief, we consider the KIST and KIST formative registrations stipulated into the record. Therefore, we consider it stipulated into the record that two of the KIST registrations on this list were for soda beverages (Registration Nos. 0158917 and 269794); one was for flavoring agents for food (Registration No. 0212910); that all the KIST registrations have expired (Registration No. 0158917 issued September 19, 1922 and cancelled June 21, 2003; Registration No. 0212910 issued May 18, 1926 and cancelled February 24, 2007; Registration No. 2697947 issued March 18, 2003 and cancelled October 25, 2013); and that one of the KIST registrations was not in the name of Applicant or its predecessor in interest, Leading Edge Flavors, Inc., dba Leading Edge Brands (LEB): Registration No. 0158917, Monarch Company assignee. The cancelled KIST registration on this list owned by Applicant as assignee (Registration No. 2697947) also was submitted into the record by way of witness testimony as a TSDR printout; the change in ownership by assignment to Applicant is not reflected on the printout. Dabish Declaration, exhibit C, 43 TTABVUE. Generally, cancelled registrations are evidence only that the registrations issued.

services under the SUNKIST mark. Holme declaration, paragraphs 3 and 4, 28 TTABVUE; Madden declaration, paragraph 2, 31 TTABVUE. For at least 90 years, Opposer has offered SUNKIST branded beverages directly to consumers or through various licensees. Holme declaration, 28 TTABVUE, paragraph 18.

SUNKIST-branded beverages are an extremely important part of Opposer's licensing program and business in the United States. Holme declaration, paragraph 7, 28 TTABVUE; Madden declaration, paragraph 2, 31 TTABVUE.[17] Opposer's two biggest beverage licensees in the United States are Keurig Dr. Pepper (soft drinks) and Nestle Professional (beverages delivered via beverage dispensers). Madden declaration, paragraphs 7, 8, 31 TTABVUE. Sunkist also has license agreements with Jel Seit to sell SUNKIST branded drink mixes, liquid water enhancers, and freezable novelties and Lyons Magnus for use with not-from-concentrate orange juice. Madden declaration, paragraphs 9, 10, 31 TTABVUE.

Applicant Intrastate Distributors, Inc. is a bottling company of company-owned brands, private label products, and some regional brands. Dabish declaration, paragraph 3, 43 TTABVUE. IDI's company-owned brands include KIST, FROSTIE, and TOWNE CLUB. Dabish declaration, paragraph 3, 43 TTABVUE. IDI purchased the KIST brand from its prior owner LEB, which continuously used the KIST brand from at least 2000 to the 2009 purchase date. Dabish declaration, paragraph 4, exhibit C, 43 TTABVUE; Smith declaration, paragraphs 3-4, 44 TTABVUE. LEB used KIST in connection with canned soda products and owned a trademark for KIST that

---

[17] Much of the information (e.g., advertising and sales) has been provided confidentially, so we reference it in general terms.

Opposition No. 91254647

issued in 2003 (Registration No. 2697947 listing a 1953 first use in commerce date and referencing the two prior KIST registrations from Applicant's list of registrations (Registration No. 0158917, issued September 19, 1922, and cancelled June 21, 2003) and Registration No. 0212910 (issued May 18, 1926, and cancelled February 24, 2007) *see supra* n.16.[18] Dabish declaration paragraphs 4, and 7, exhibit C, 43 TTABVUE. The registration was transferred and assigned[19] with the sale to Applicant, but this KIST registration inadvertently cancelled in 2013. Dabish declaration paragraphs 4, and 7, 43 TTABVUE.

After acquiring the mark, Applicant used the KIST mark with canned soda products, although Applicant now (and since 2014) uses the KIST brand on two glass-bottled nostalgia soda products as well as sparkling water products. Dabish declaration paragraph 8, 43 TTABVUE. In the past, there existed a trademark registration for KIST for soda beverages (owned by Monarch Company (and identified by the witness as Monarch Beverage Company)) that has since expired. Applicant's notice of reliance, 42 TTABVUE and n.16.

Applicant's witness Mr. Dabish testified about his awareness of KIST soda beverages in the twentieth century and provided a composite exhibit which included photos of various packaged uses of KIST with soda: glass soda bottles, canned soda, and plastic soda bottles. Dabish declaration, paragraph 6 and Exhibit G, 43 TTABVUE. The KIST glass-bottled nostalgia soda is marketed with a number of

---

[18] The asserted 1953 date is not evidence of first use. Trademark Rule 2.122(b)(2), 37 C.F.R. § 2.122(b)(2).

[19] As indicated in n.16, the TSDR printout (provided as exhibit C) shows that Office records still reflect ownership in the name of LEB at the time of the 2013 cancellation.

Appx8

different "nostalgia" glass-bottled sodas; the photographic exhibit provided by Applicant's witness shows glass-bottled KIST soda being sold with other "Great American Soda Classics," in a variety pack (e.g., Dad's Root Beer, Moxie, Frostie, Faygo among others). Dabish declaration, Exhibit G, 43 TTABVUE.

### Entitlement to a Statutory Cause of Action

In every inter partes case, the plaintiff must establish its statutory entitlement to bring an opposition or cancellation proceeding. To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) proximate causation. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *4 (Fed. Cir. 2020). Demonstrating a real interest in opposing registration of a mark satisfies the zone-of-interests requirement, and demonstrating a reasonable belief in damage by the registration of a mark demonstrates damage proximately caused by registration of the mark. *Id*. at *7-8.

Opposer has properly made its pleaded registrations of record by submitting copies from the TSDR electronic database, under notice of reliance, and accompanying TSDR copies with its notice of opposition.[20] Trademark Rule 2.122(d)(1)-(2), 37 C.F.R. §§ 2.122(d)(1)-(2).

The pleaded registrations establish Opposer's direct commercial interest and real interest in the proceeding and its reasonable belief in likely damage, establishing its

---

[20] Opposer's first notice of reliance 25 TTABVUE; Notice of Opposition, 1 TTABVUE.

entitlement to oppose registration of Applicant's trademarks.[21] *See Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 64 USPQ2d 1375, 1377 (Fed. Cir. 2002) ("In most settings, a direct commercial interest satisfies the 'real interest' test"); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (pleaded registrations "suffice to establish … direct commercial interest"; a belief in likely damage can be shown by establishing a direct commercial interest); *Monster Energy Co. v. Lo*, 2023 USPQ2d 87, at *11 (TTAB 2023) (valid and subsisting pleaded registration made of record establishes entitlement to oppose); *Shenzhen IVPS Tech. Co.*, 2022 USPQ2d 1035, at *13-14 (valid and subsisting pleaded registration establishes opposer's direct commercial interest in the proceeding and its belief in damage in connection with likelihood of confusion claim) (citation omitted).

## Priority

Because Opposer's pleaded registrations are of record and Applicant has not brought a counterclaim to cancel them, priority is not an issue with respect to the goods identified in the registrations.[22] *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

## Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177

---

[21] Applicant did not address Opposer's entitlement in its brief.
[22] Applicant did not address Opposer's priority in its brief.

Opposition No. 91254647

USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered, referred to as "*DuPont* factors").

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). We discuss the *DuPont* factors for which there is relevant argument and evidence. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019) (the Board considers each *DuPont* factor for which there is evidence and argument); *see also Herbko Int'l*, 64 USPQ2d at 1380 ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods.'").

We focus our analysis on Registration No. 578492 for the mark SUNKIST (standard characters) for citrus flavored soft drinks and concentrates for making the same; and citrus fruit products used as ingredients in such soft drinks-namely, citrus oils. A finding of no likelihood of confusion between Applicant's KIST marks and the standard character SUNKIST mark means we also would not find likelihood of confusion as to the other pleaded SUNKIST registrations that either are typed or standard character, stylized, or contain words and a design. *See In re Allegiance Staffing*, 115 USPQ2d 1319, 1325 (TTAB 2015) ("[I]f there is no likelihood of confusion between Applicant's mark and ALLEGIS in standard characters, then

there would be no likelihood of confusion with the other ALLEGIS marks."); *In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010). Therefore, in this decision, we refer to SUNKIST (Registration No. 578492) as the pleaded mark.

### A. Similarity or Dissimilarity of the Goods

Under the second *DuPont* factor we consider the "similarity or dissimilarity and nature of the goods or services as described in an application or registration." *Dupont* 177 USPQ at 567. We evaluate the relatedness of the goods based on their identifications in the subject application and the pleaded registration. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014). It is sufficient if likelihood of confusion is found with respect to use of the mark on any item that comes within the description of goods in the application or registration. *Tuxedo Monopoly, Inc. v. General Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

Applicant's goods are "Soft drinks, namely, sodas and sparkling water; concentrates and syrups for making soft drinks" and Opposer's goods in the pleaded mark are "citrus flavored soft drinks and concentrates for making the same; and citrus fruit products used as ingredients in such soft drinks-namely, citrus oils." Applicant's soda soft drink goods and concentrates for making soft drinks necessarily encompass Opposer's more narrowly defined citrus flavored soft drinks and concentrates for making citrus flavored soft drinks. *See In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified

'residential and commercial furniture.'"). We find the goods are legally identical in part.[23]

The second *DuPont* factor weighs in favor of likelihood of confusion.

### B. Similarity or Dissimilarity of Trade Channels

Under the third *DuPont* factor, we consider the "similarity or dissimilarity of established, likely-to-continue trade channels." *DuPont*, 177 USPQ at 567. We base our consideration of the channels of trade on the basis of the goods recited in the application and pleaded mark. *Octocom Sys. Inc. v. Houston Comps. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application, regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed.").

Because the goods in Applicant's applications and Opposer's pleaded mark are legally identical in part, we presume that these identical goods will move in the same trade channels to the same classes of purchasers.[24] *See In re Viterra Inc.*, 101 USPQ2d at 1908; *In re Medline Indus., Inc.*, 2020 USPQ2d 10237 at *4 (TTAB 2020). In addition, witness testimony confirms that both parties sell their soda goods in supermarkets and grocery stores, evidencing overlap of trade channels.

The third *DuPont* factor weighs in favor of likelihood of confusion.

---

[23] Applicant has not addressed this *DuPont* factor in its brief.
[24] Applicant has not addressed this *DuPont* factor in its brief.

Opposition No. 91254647

## C. Conditions of Sale

The fourth *DuPont* factor considers the "conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing." *DuPont*, 177 USPQ at 567. We must make our determination based on the least sophisticated consumer. *Stone Lion*, 110 USPQ2d at 1163-64 (affirming that TTAB properly considered all potential investors for recited services, which included sophisticated investors, but that precedent requires consumer care for likelihood of confusion decision to be based "on the least sophisticated potential purchasers").

The purchasers of Applicant's and Opposer's goods are general consumers. The soft drinks identified in the applications and in the pleaded mark can be inexpensive goods which could be purchased on impulse or without a great deal of care by ordinary consumers. As a general proposition, inexpensive goods may be purchased with less care, which increases the likelihood of confusion. *Recot Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000) ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care") (citations omitted). We find that the purchase of soft drinks is done with nothing more than ordinary care and is subject to impulse purchase.[25]

The fourth *DuPont* factor weighs in favor of a finding of likelihood of confusion.

---

[25] Applicant has not addressed this *DuPont* factor in its brief.

14

Appx14

Opposition No. 91254647

### D. Strength of Opposer's mark

In determining the strength of a mark, we consider both its conceptual strength, based on the nature of the mark itself, and its commercial strength, based on the marketplace recognition value of the mark. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength ...."); *Top Tobacco, L.P. v. North Atl. Operating Co., Inc.*, 101 USPQ2d 1163, 1171-72 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength). Market strength is the extent to which the relevant public recognizes a mark as denoting a single source. *Tea Bd. of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006). In tandem, if there is evidence in the record, we consider whether the mark has commercial weakness in the marketplace.[26] *DuPont*, 177 USPQ at 567.

Because SUNKIST is registered on the Principal Register without a claim of acquired distinctiveness, we presume that the mark as a whole is inherently distinctive. Trademark Act Section 7(b), 15 U.S.C. § 1057(b). Nonetheless, we may consider whether an inherently distinctive mark is "weak as a source indicator" in the course of a *DuPont* analysis. *See In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1517-18 (TTAB 2016).

To determine the conceptual strength of Opposer's mark, we evaluate its intrinsic nature, that is, where it lies "along the generic-descriptive-suggestive-arbitrary (or

---

[26] Opposer points out that there is no evidence of third-party use of SUNKIST in the record. 53 TTABVUE 25.

fanciful) continuum of words." *In re Davia*, 110 USPQ2d 1810, 1814 (TTAB 2014); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000) ("[W]ord marks that are [arbitrary, fanciful, or suggestive] are held to be inherently distinctive.").

Opposer argues that SUNKIST is not in the dictionary and has no recognized meaning. Opposer's brief, 53 TTABVUE 25. However, Opposer also argues the connotation of SUNKIST (under *DuPont* factor one) is suggestive, stating that "SUNKIST suggests that the fresh fruit offered under the mark is kissed by the sun or sun kissed." Opposer's brief, 53 TTABVUE 25. We take this statement as an admission that SUNKIST could be perceived as the phonetic equivalent of "sun-kissed." *See e.g., Robinson v. Hot Grabba Leaf, LLC*, 2019 USPQ2d 149089, at *8 (TTAB 2019) (statements in brief considered "admissions that the term 'grabba' is currently viewed by the relevant public as, at a minimum, immediately conveying information about an ingredient or characteristic of tobacco, or tobacco products, including cigar wraps") *cancellation order vacated on default judgment*, No. 0:19-cv-61614-DPG (S.D. Fla. Dec. 17, 2019).

Because we may consider dictionary definitions in connection with determining the conceptual strength of a mark, we take judicial notice of the dictionary definition of "sun kissed" which is defined as ": having plenty of bright sunlight :sunny."[27] *See*

---

[27] The Board may take judicial notice of dictionary definitions, including definitions in online dictionaries which exist in printed format or that have regular fixed editions. *In re White Jasmine LLC*, 106 USPQ2d 1385, 1392 n.23 (TTAB 2013). Merriam-Webster Dictionary, merriam-webster.com (accessed September 26, 2023).

Opposition No. 91254647

*In re FabFitFun, Inc.*, 127 USPQ2d 1670, 1673 (TTAB 2018) (considering dictionary definition of "smoking hot" in relation to identified goods, cosmetics, for purposes of determining conceptual strength of the mark and finding the term highly suggestive as it indicates the purpose or intended result of the goods); *In re Azteca Rest. Enters. Inc.*, 50 USPQ2d 1209, 1212 (TTAB 1999) (suggestiveness of Azteca established by dictionary definition and further confirmed by third-party registrations); *see also Hancock v. Am. Steel & Wire Co. of N.J.*, 203 F.2d 737, 97 USPQ 330, 332 (CCPA 1953) (dictionary definitions considered "to determine the ordinary significance and meanings of words."). *Cf. Shenzhen IVPS Tech. Co.*, 2022 USPQ2d 1035 at *25 (considering dictionary definition of "smoke" in connection with phonetic equivalent term SMOK to determine whether "the SMOK family feature in Opposer's alleged family of marks is distinctive, highly suggestive, or descriptive").

We find that SUNKIST, which Opposer indicates is phonetically equivalent to "sun-kissed," has a somewhat suggestive meaning, as it suggests the sunny growing conditions in California for Opposer's citrus fruit. This suggestion is confirmed by historical advertising and recent digital advertising provided by Opposer which touts the California sunshine under which Opposer's citrus fruits are grown.[28] *See*

---

[28] Text from current and historical advertising includes the following:

- "California sunshine" makes the "famous Sunkist oranges lemons and grapefruit so especially refreshing and healthful";
- "sunny citrus groves";
- "cheers to more sunshine at happy hour" (featuring tangelo juice);
- "sunnylicious days are here … with Cali the Sunkist California Mandarin";
- "Six months of California sunshine burst free when you open a Sunkist orange";
- "Sunkist has a decidedly different flavor – lively, sunny with a tree-ripened taste. This difference is simply the difference between California oranges and fruit from other

Opposition No. 91254647

*Citigroup Inc. v. Cap. City Bank Grp.*, 94 USPQ2d 1645, 1668 (TTAB 2010) ("CITIBANK, although inherently distinctive, is suggestive"), *aff'd*, 637 F.3d 1344 (Fed. Cir. 2011).

Turning to commercial strength, Opposer argues that its SUNKIST mark is famous.[29] Commercial strength of a mark may be measured indirectly by the volume of sales and advertising expenditures in connection with the goods or services sold under the mark, and other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods or services identified by the marks; and the general reputation of the goods or services. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1308 (Fed. Cir. 2002) (recognizing indirect evidence as appropriate proof of strength); *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, 109 USPQ2d 1347, 1354 (TTAB 2014). A mark's renown may "var[y] along a spectrum from very strong to very weak." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (internal quotations omitted).

---

parts of the country. Warm sunshine, cool nights and mountain water put a sharper flavor, a deeper richer color in California ...."
- "Sunkist Oranges are the finest of the crop of California, where sunshine, mineral rich soil, cool nights combine to produce oranges of the highest quality."

Holme declaration exhibits, 26 and 27 TTABVUE; Madden declaration exhibits, 31 TTABVUE 46, 57, 76.

The success of this marketing has been tested by the Nestle Professional survey, filed confidentially and referenced by Opposer's witness. Holme declaration, 27 TTABVUE.

[29] Applicant has not addressed Opposer's arguments as to fame in its brief, but it is Opposer's burden to prove fame. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1367 (Fed. Cir. 2012) (holding that it is the opposer's burden to prove fame of its mark).

Appx18

Opposition No. 91254647

SUNKIST branded beverage products "include, but are not limited to, carbonated soft drinks (CSD's), 100% juice, juice drinks, flavored water and tea." Madden declaration, paragraph 6, 31 TTABVUE. Through licensing, the SUNKIST mark has been continuously used in connection with carbonated beverages since 1977. Holme declaration, paragraphs 8-9, 28 TTABVUE. Opposer's carbonated soft drinks are widely available (the percentage of market exposure is confidential), with the current licensee, Keurig Dr. Pepper, selling "SUNKIST brand soft drinks throughout the United States, in grocery stores, supermarkets, drugstores, convenience stores, Dollar stores, and the like." Dabrowski declaration, paragraph 11, 33 TTABVUE; Madden declaration, paragraph 6, 31 TTABVUE. Keurig Dr. Pepper has "pouring rights at different venues" such as the American Airlines Center, Dallas-Ft. Worth. Dabrowski declaration, paragraph 15, 33 TTABVUE. "In March 2021, SUNKIST branded carbonated soft drinks became the number one fruit flavor carbonated soft drink brand in the United States" "in terms of bottle/can volume in the marketplace"; it is "the number one [selling] orange [carbonated soft drink] and the number one diet orange (now known as "Zero") carbonated soft drink" in the United States as of 2021 based on industry reports to which Opposer subscribes. Madden declaration, paragraph 24, 31 TTABVUE; Dabrowski declaration, paragraph 8, 33 TTABVUE. Sunkist also is "the number one carbonated soft drink dollar growth brand in the US over the past two years." Madden declaration, paragraph 24, 31 TTABVUE; Dabrowski declaration, paragraph 8, 33 TTABVUE. Keurig Dr. Pepper confidentially provided its annual sales revenue for the carbonated beverages, from 2017 through

2021, and its soft drink case sales from 2007 to 2021, which by any standard, are substantial. Dabrowski declaration, paragraph 22, 33 TTABVUE.

Mr. Dabrowski indicated that most marketing for the carbonated beverage is developed and provided in-house, and he provided dollar figures that grouped Keurig Dr. Pepper's marketing and promotional expenditures for the SUNKIST brand with other expenditures (innovation, trade support, distribution). Dabrowski declaration, paragraphs 12, and 21, 33 TTABVUE. Therefore, we do not have separate figures for marketing or advertising of the carbonated soda beverages. Opposer's licensee Keurig Dr. Pepper utilizes "all types of media," which includes but is "not limited to social media, television, paid sponsorships, radio and digital advertisements, [and] sports sponsorships with major college conferences." Dabrowski declaration, paragraph 13, 33 TTABVUE; Madden declaration, paragraph 13, 31 TTABVUE. However, this testimony is lacking in specifics as to frequency, and audience reach; much of the testimony in the record relates to promotional activities that are not recent (e.g., past television series placements, the Fiesta Bowl, and Myspace concert series). Dabrowski declaration, paragraphs 17 and 18, 33 TTABVUE; Madden declaration paragraphs 15-16, 31 TTABVUE.

Opposer relies on industry data relating to brand awareness (which is high and provided confidentially), and also relies on confidential third-party IRI data to which it subscribes to learn how often its carbonated soda product is found in United States consumers' homes on a rolling 18-month basis. Dabrowski declaration, paragraphs 19 and 20, 33 TTABVUE. There is no evidence of media mentions in the record.

Also in connection with strength, Opposer provided evidence by notices of reliance that it polices its marks by the filing of oppositions with the Trademark Trial and Appeal Board and by recording its federal trademark registrations with U.S. Customs. Opposer's third notice of reliance, 45 TTABVUE; Opposer's fourth notice of reliance, 46 TTABVUE. Opposer also provided its listings/rankings for Opposer in the License Global publication as one of the top licensed global brands; the articles provided state on their face that License Global annually tracks "retail sales of licensed merchandise from the world's leading brands across every segment of consumer products." Holme declaration, paragraph 20, 28 TTABVUE. Because this is an industry publication, it is not clear that the general consumer is aware of this publication or its rankings.

The record is devoid of third-party uses or registrations of the same or similar sun-kissed formative marks in the industry.

Overall, despite some deficiencies in the testimony and evidence, we find based on this record that Opposer's mark is commercially strong for carbonated soda drinks, specifically, citrus flavored soda, and has a high degree of public recognition and renown.[30]

The fifth *DuPont* factor weighs in favor of likelihood of confusion.

---

[30] Because Section 2(d) fame is a matter of degree along a continuum, we need not determine whether Opposer has established the highest degree of renown for its mark (as we would for a claim of dilution under Section 43(c)).

### E. Similarity or Dissimilarity of the Marks

Under the first *DuPont* factor, we examine the similarities and dissimilarities of the parties' marks in their entireties as to appearance, sound, meaning, and commercial impression. *See In re Viterra Inc.*, 101 USPQ2d at 1908 (quoting *DuPont*, 177 USPQ at 567).

"The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs.,* 101 USPQ2d at 1721 (citation omitted). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Inter IKEA Sys. B.V. v. Akea, LLC,* 110 USPQ2d 1734, 1740 (TTAB 2014); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975).

Our analysis cannot be predicated on dissecting the marks into their various components; the decision must be based on the entire marks, not just part of the marks. *In re Nat'l Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion.").

Applicant's marks are KIST (standard characters) and KIST (stylized). Opposer's pleaded mark is SUNKIST, also in standard characters. Applicant's and Opposer's standard character marks are not limited to any particular font style, size, or color

and could be displayed in the same manner. Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a). Opposer's standard character pleaded mark also could be displayed in the same stylization as Applicant's stylized KIST mark.

The marks are similar in appearance and sound to the extent they both contain the term KIST. Although there is no correct pronunciation of a trademark, *In re Viterra Inc.*, 101 USPQ2d at 1912, both Opposer and Applicant are in agreement that KIST, the entirety of Applicant's mark and the suffix portion of Opposer's SUNKIST mark, can be pronounced phonetically as "kissed," which makes Applicant's mark similar in sound to the KIST suffix portion of Opposer's pleaded mark. The marks are dissimilar in appearance and sound to the extent that Opposer's pleaded mark contains the additional lead word SUN.

As to connotation, Opposer states that SUNKIST connotes the phonetic equivalent of "sun-kissed" which we have judicially noticed as having a specific dictionary meaning of sunny or intense sunshine. KIST in Applicant's mark could be considered arbitrary or, as both parties agree, the phonetic equivalent of KISSED. We take judicial notice that "kissed" is defined as ": to touch (someone or something) with the lips especially as a mark of affection or greeting."[31]

Opposer argues that both marks connote a "kiss." Opposer's reply brief, 57 TTABVUE 10. Applicant disagrees. Applicant submits that "the vast majority of Opposer's marketing over the decades has focused specifically on citrus fruit and has contained orange colors and sun images, cementing the association of SUN into its

---

[31] Merriam-Webster Dictionary, merriam-webster.com (accessed September 26, 2023).

Opposition No. 91254647

marks" and submits that the word SUN dominates Opposer's marks. Applicant's brief, 56 TTABVUE 9. Applicant also argues that "Opposer's own description of the connotations of SUNKIST and KIST admits that their connotations are significantly different. While both have some notion of being kissed, SUNKIST refers to "kissed by the sun" and thus connotes a natural phenomenon. … In contrast, "KIST" connotes being kissed by another person, in a romantic or erotic context." Applicant's brief, 56 TTABVUE 9.

In connection with connotation and commercial impression, we can consider the parties' trade dress. *See Burns Philp Food, Inc. v. Modern Prods., Inc.*, 1 F.3d 1252, 28 USPQ2d 1687, 1690 (Fed. Cir. 1993) ("[T]rade dress can be used as evidence of whether a word mark projects *a confusingly similar or different* meaning or impression."), quoting J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20.04 [1], at 20-28 (3d ed. 1992) (emphasis added in decision). Applicant markets KIST to reference a kiss:



Dabish declaration, exhibit F, 43 TTABVUE.

Opposer markets SUNKIST to reference the sun:

Opposition No. 91254647








Holme declaration, 28 TTABVUE, and 26 TTABVUE, confidential exhibit E. [32]

Some of the pleaded registrations listed above include the sun design as shown in

Opposer's labels, packaging, and marketing, which Opposer describes as "an image

---

[32] Although the exhibits to the Holme declaration were designated as confidential, clearly the advertisements and packaging, which are shown publicly to the consumer, are not, and we have not treated them as such. Trademark Rule 2.116(g), 37 C.F.R § 2.116(g)  ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party.").

Opposition No. 91254647



of a sun with rays." (*see e.g.*, Registration No. 4482629, n.10). We find that SUNKIST and KIST are dissimilar in connotation and commercial impression.

Although there are some clear similarities in the marks, we find that the dissimilarities in connotation and commercial impression weigh heavily against confusion. *See e. g, Citigroup*, 94 USPQ2d at 1664 (although the marks were "superficially similar" to the extent both marks contained the term "City Bank/Citibank," CITIBANK has a different commercial impression from CAPITAL CITY BANK "because applicant's marks start with the word 'Capital,' the commercial impression engendered by applicant's marks is entirely different. Applicant's marks will be perceived as CAPITAL CITY ... bank, not as CAPITAL ... CITY BANK"). *Cf. Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 223 USPQ 1281, 1283 (Fed. Cir. 1984) ("It is the similarity of commercial impression between SPICE VALLEY and SPICE ISLANDS that weighs heavily against the applicant"); *Proctor & Gamble Co. v. Conway,* 419 F.2d 1332, 164 USPQ 301, 304 (CCPA 1970) ("A designation may well be likely to cause purchaser confusion as to the origin of goods because it conveys, as used, the same idea, or stimulates the same mental reaction, or in the ultimate has the same meaning.").

Because the commercial impression engendered by KIST is significantly different from the commercial impression created by SUNKIST, and the appearance, sound

and connotation are only superficially similar, the first *DuPont* factor weighs against likelihood of confusion.

### F. Actual Confusion

Under the seventh and eighth *DuPont* factors, we consider the nature and extent of any actual confusion in light of the length of time and conditions under which there has been contemporaneous use of Opposer's and Applicant's marks. *DuPont*, 177 USPQ at 567. The seventh and eighth *DuPont* factors are interrelated; the absence of evidence of actual confusion, under the seventh *DuPont* factor, by itself is entitled to little weight in our likelihood of confusion analysis unless there also is evidence, under the eighth *DuPont* factor, that there has been a significant opportunity for actual confusion to have occurred. *See Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant or reasonable opportunity for actual confusion to have occurred); *In re Cont'l Graphics Corp.*, 52 USPQ2d 1374, 1377 (TTAB 1999); *Gillette Can. Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). Thus, if there has been appreciable and continuous use by an applicant of its mark for a significant period of time in the same markets as those served by an opposer, absence of any reported instances of confusion is probative. *Citigroup*, 94 USPQ2d at 1660. We "look at actual market conditions, to the extent there is evidence of such conditions of record," under the eighth *DuPont* factor. *See In re Guild Mtg. Co.*, 2020 USPQ2d 10279, at *6 (TTAB 2020).

Applicant argues there is no actual confusion under the seventh *DuPont* factor, Applicant's brief, 56 TTABVUE 10, while Opposer argues that the seventh and eighth

Opposition No. 91254647

*DuPont* factors are neutral because Applicant's applications are intent-to-use. Opposer's brief, 53 TTABVUE 30. Although Applicant filed its applications as intent-to-use, Applicant's testimony indicates that the KIST marks have been and are in use in connection with soda beverages and sparkling water. Dabish declaration paragraphs 8, 9, 10, 11, 12, 43 TTABVUE.

The record indicates that KIST has been used in connection with carbonated soda beverages at least as early as 2000 by Applicant's predecessor in interest LEB. According to Applicant's witness Randal Smith, a former employee of LEB,[33] LEB purchased the rights to the KIST mark from Monarch Beverage Company in 1998. Smith declaration, paragraph 3, 44 TTABVUE. Mr. Smith indicates that while working at LEB, KIST canned soda was sold in the Southeast, including the states of North and South Carolina, Georgia and Alabama; KIST canned soda was also sold in the states of Texas, Oklahoma, Nebraska, Indiana, as well as other Midwestern states. *Id.* paragraph 4. Since Applicant's purchase of the KIST brand, KIST has been in continuous use. Dabish Declaration, paragraphs 4, 5, 43 TTABVUE. Applicant distributed the KIST brand soda, in cans, in the south, with expanded sales of the KIST canned soda products into Ohio, Michigan, and Illinois. *Id.* paragraph 7. Applicant discontinued canned soda KIST sales in 2014, switching to glass-bottled soda; it now sells two "nostalgia" KIST soda products in glass bottles throughout the United States. *Id.* paragraphs 8, 10. Also since 2014, Applicant promotes sparkling water products under the KIST brand; these goods are sold in the states of Wisconsin,

---

[33] As noted above, LEB was the prior owner, transferor and assignor of the now cancelled KIST mark, Registration No. 2697947, which issued in 2003 and cancelled in 2013.

Iowa, Minnesota, Illinois, Michigan, Ohio, Pennsylvania, Virginia, North Carolina, South Carolina, Georgia, Florida, Missouri, and Indiana. *Id.* paragraph 9. Presently, one of Applicant's distributors, KeHE, distributes KIST products to Publix supermarkets in the Southeast. *Id.* paragraph 11. Applicant also distributes its KIST products directly to retail outlets such as Kroger, Menards, and Walmart. *Id.* paragraph 12.

Opposer indicates that, according to third-party IRI data, its goods, including carbonated soda drinks, are sold in 85% of grocery stores (not including small grocery stores or Costco) throughout the United States. Madden declaration paragraph 6, 31 TTABVUE; Dabrowski declaration, paragraph 11, 33 TTABVUE (goods are sold to grocery stores). In its brief, Opposer argues that the parties' trade channels overlap, referencing Applicant's testimony that it sells its goods to Publix, Kroger, Menards and Walmart, and also referencing Opposer's witnesses' testimony that Opposer's beverages and sodas are sold at convenience stores, grocery stores, big box stores, and drug stores, among others. Opposer's brief, 53 TTABVUE 24.

Opposer disputes any significant co-existence, arguing that based on the evidence in the record, Applicant's sales are small or declining. Opposer's brief 53 TTABVUE 30; Opposer's reply brief, 57 TTABVUE 6, 10. Opposer submits that the record does not support that "consumers are aware of KIST marks." Opposer's reply brief, 57 TTABVUE 6, 10.

However, we find that Applicant's sales of the products, although more regional, were and are in overlapping geographic markets with Opposer's products, offered in

the same retail stores, and have co-existed in those same geographic markets for a significant period of time. We find that Applicant's sales are not so de minimis that the lack of actual confusion is insignificant. *See Citigroup*, 94 USPQ2d at 1662 (finding no actual confusion significant based on applicant's use of the mark since the late 1970s at 69 bank branches in Florida, Georgia and Alabama); *In re Ass'n of the U.S. Army*, 85 USPQ2d 1264, 1273 (TTAB 2007) (concurrent use of the marks in the same geographic area for a significant period may "suffice[ ] to establish, under the eighth *du Pont* factor, that the absence of evidence under the seventh *du Pont* factor is legally significant and entitled to some weight.").

Based on this evidence, we find that there has been a reasonable opportunity for confusion to have occurred as the parties sell their carbonated sodas in the same geographic areas and by the same retailers since 2000. Therefore, under the seventh and eight *DuPont* factors, the lack of any reported instances of confusion weighs against a finding of likelihood of confusion.

### G.  Balancing the Factors

We find the similarity of the goods, the channels of trade, conditions of sale, and strength of the mark weigh in favor of a finding of likelihood of confusion, while the similarity of the marks and the lack of actual confusion weighs against likelihood of confusion.

In any likelihood of confusion case, any of the factors may play a dominant role, *DuPont*, 177 USPQ at 567. We conclude, that despite the legal identity in part of the parties' goods, their identical trade channels, the conditions of sale, and the commercial strength or fame of Opposer's SUNKIST mark, the differences in

Opposition No. 91254647

commercial impression of the marks and the lack of actual confusion over a long period outweigh these factors. We find that Applicant's KIST marks are not likely to cause confusion with Opposer's SUNKIST marks for legally identical in part goods.

**Dilution**

In addition to its Section 2(d) claim, Opposer has asserted a dilution claim under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

Fame for dilution requires a more stringent showing than likelihood of confusion fame. *Palm Bay Imps. Inc. v. Veuve Clicquot*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005); *Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1170 (TTAB 2001). Dilution fame "is an either/or proposition—fame either does or does not exist—". *Coach Servs.,* 101 USPQ2d at 1724 (quoting *Palm Bay Imps.*, 73 USPQ2d at 1694). Opposer must show dilution by a preponderance of the evidence. *Chanel, Inc. v. Makarczyk*, 110 USPQ2d 2013, 2017 (TTAB 2014).

"It is well-established that dilution fame is difficult to prove." *Coach Servs.*, 101 USPQ2d at 1724. The "threshold question in a federal dilution claim is whether the plaintiff's mark is 'famous." *N.Y. Yankees P'ship v. IET Prods. and Servs., Inc.*, 114 USPQ2d 1497, 1502 (TTAB 2015). Also, in contrast to likelihood of confusion fame, dilution fame is not determined in the context of a certain field of goods or services; rather, the party asserting dilution fame of its mark "must show that, when the general public encounters the mark 'in almost any context, it associates the term, at least initially, with the mark's owner." *Coach Servs.*, 101 USPQ2d at 1725. In other words, a famous mark is one that has become a "household name." *Id*.

31

Opposer alleges in its pleading that its marks became famous before the filing date of Applicant's intent to use application "or any other date on which it can rely" but only argues in its brief that its mark was famous long before the 2019 application filing dates. Opposer's brief, 53 TTABVUE 31. We find that, because the record shows that Applicant's predecessor in interest began using KIST at least by 2000, Opposer must prove fame before that date, and not the filing date of the intent to use applications.[34] *Citigroup*, 94 USPQ2d at 1649-50; *ProMark Brands Inc. v. GFA Brands, Inc.*, 114 USPQ2d 1232, 1250 (TTAB 2015) ("[A]n element of the dilution claim is the acquisition of fame prior to the defendant's first use or application filing date").

We find that Opposer cannot not succeed on its dilution claim because the testimony in the record only addresses sales and marketing expenditures for fresh fruit from 2013 to 2021 (confidential) and for carbonated soda from 2007 to 2021 (confidential). Although Opposer's witness provided annual reports for 1947, 1951 and 1953 which discuss sales and shipments, and advertising efforts with no dollar amounts provided, aside from the age, this information is hearsay because the witness did not testify about them or use them for this purpose.[35] Holme declaration, 28 TTABVUE.

---

[34] We find this defense to the dilution claim was tried by implied consent in view of Applicant's testimony about its long use prior to the filing date of its intent to use applications.

[35] In any event, no context is provided for these raw statistics so as to allow the Board to compare Opposer's performance with that of similar businesses to determine fame and, this information would not prove dilution at the time of Applicant's predecessor in interest's use in 2000 because dilution fame is something that can be lost. *See TiVo Brands, LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1113 (TTAB 2018).

We find that Opposer cannot prevail as a matter of law on its claim of dilution because it has not proven that its SUNKIST mark became famous prior to Applicant's (predecessor in interest's) first use of the KIST mark. *Citigroup Inc.*, 94 USPQ2d at 1666 ("[B]ecause opposer did not prove that its CITIBANK marks became famous prior to applicant's first use of its mark, opposer's dilution claim fails.").

Additionally, even if we were to find that Opposer has established that its SUNKIST mark became famous before Applicant's predecessor in interest's first use of KIST in 2000, the evidence in the record is not sufficient to support the threshold question of dilution fame. The Trademark Dilution Revision Act (TDRA) lists four non-exclusive factors for courts to consider when determining whether a mark is famous:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Opposer's SUNKIST mark (either words (typed, standard character or stylized) or words and design) is the subject of 75 registrations on the Principal Register without a showing of acquired distinctiveness. Holme declaration, paragraph 6, 28 TTABVUE. Opposer has used the SUNKIST mark since 1907 in connection with fresh fruit. Madden declaration, paragraph 2, 31 TTABVUE. For at least 90 years,

Opposition No. 91254647

Opposer has used the SUNKIST mark with beverages offered directly to consumers by Opposer or through various licensees. Holme declaration, paragraphs 3, 4, 8, 9, 28 TTABVUE. Opposer's United States sales revenues of fresh fruit and beverages are confidentially provided and are substantial; Opposer offers its fresh fruit and beverage products across the United States. Madden declaration, paragraphs 6, 18, 31 TTABVUE; Dabrowski declaration paragraphs 11, 22, 33 TTABVUE. Other SUNKIST branded food products include confectionaries, freeze dried fruit, fresh cut fruit, frozen fruit, frozen snacks, a range of nuts, sauces, marinades, and trail mix which also are offered across the United States. Madden declaration, paragraph 6, 31 TTABVUE. Opposer also sells SUNKIST branded juicers. Madden declaration paragraph 12, 31 TTABVUE.

Opposer's witnesses have provided testimony (some with exhibits) relating to advertising, including advertising from the 1950s and 1960s, past promotional partnerships in television, movies, a My Space concert series, and a 25-year partnership with Disneyland which ended in the 1990s. Holme declaration, paragraphs 14-16, 28 TTABVUE; Madden declaration, paragraphs 15-17, 31 TTABVUE; Dabrowski declaration, paragraphs 13, 14, 16, 17, 18, 33 TTABVUE. Also in the record are historical newspaper advertisements, but we have no specific testimony relating to these advertisements and their circulation.[36] Opposer's second notice of reliance, 29 TTABVUE.

---

[36] The newspaper advertisements range from the 1916/1917, the 1920s, the 1930s, 1950s, 1960s, and 1970s, with the majority from the 1950s and 1960s. Many of the advertisements are grocery advertisements. Some advertisements are not full page, half page or quarter page, and some of these advertisements appear to be placed in small circulation newspapers.

Opposition No. 91254647

Much of the witness testimony relating to Opposer's promotions for its fresh fruit and carbonated beverages is lacking specifics as to time periods, frequency, and audience reach to show exposure and impact on the general consumer. Opposer did confidentially provide marketing expenditures for fresh fruit for the 2013 to 2021 period, Madden declaration, 30 TTABVUE, but they are much smaller than other Board cases where we have found dilution fame. *See, e.g., Chanel, Inc. v. Makarczyk,* 110 USPQ2d at 2020-21 (advertising expenditures of $275 million between 2000-2007 and $200 million between 2009-2012 found to be substantial and to support a finding that the opposer's CHANEL mark was famous for purposes of dilution). As to the advertising for the licensee of the SUNKIST carbonated soda beverages, as indicated in the discussion regarding commercial strength, we do not have separate advertising and marketing figures, because Opposer's licensee Keurig Dr. Pepper does most marketing in-house and groups these expenditures with other expenses such as innovation, trade support and distribution.[37]

Opposer did not introduce any media evidence showing widespread recognition of Opposer's mark to the general population. Opposer also relies on a third-party survey relating to its beverage dispensing services, but the survey report is undated and is hearsay. Nor did Opposer proffer a witness with first-hand knowledge to explain the survey, the design, the questions, and whether, for example, the questions were aided or unaided. Opposer also relies on industry and third-party data that it subscribes to

---

[37] There is some information from confidential business records about the reach of a 2018 marketing campaign in connection with the regional Big East basketball tournament. Holme declaration, 27 TTABVUE.

Opposition No. 91254647

in connection with its SUNKIST branded carbonated citrus soda to support dilution fame. However, the industry and third-party data relied upon is hearsay, and Opposer did not proffer a witness to testify about how these figures were derived for market position, brand awareness, and the frequency that Opposer's carbonated soda beverages are in United States consumers' homes.

In view of the insufficiencies discussed above (relevant to factors i and iii under the TDRA), Opposer's evidentiary record in this case falls short of establishing dilution fame of SUNKIST by the relevant date. We find, on the basis of the record as a whole, that Opposer did not show by a preponderance of the evidence that SUNKIST had become "a household term [with] which almost everyone is familiar" before the relevant date. *TiVo Brands,* 129 USPQ2d at 1113 (quotation omitted).

Because Opposer failed to prove the threshold element of its dilution claim, we need not consider the other elements of Opposer's dilution by blurring claim.

**Decision**:

The opposition is dismissed as to the likelihood of confusion claim and as to the dilution claim with respect to Application Serial Nos. 88647761 and 88647766.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>24-1212</u>

**Short Case Caption:** <u>Sunkist Growers, Inc. v. Intrastate Distributors, Inc.</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>7,382</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>03/11/2024</u>

Signature: <u>/s/Leigh Ann Lindquist</u>

Name: <u>Leigh Ann Lindquist</u>

Save for Filing